William R. NOLAND *v.* Olivia L. NOLAND

96-430                                                                 932 S.W.2d 341

Supreme Court of Arkansas
Opinion delivered November 18, 1996

*Montgomery & Wyatt*, by: *Orin Eddy Montgomery*, for appellant.

*Mays & Crutcher, P.A.*, by: *Arkie Byrd*, for appellee.

TOM GLAZE, Justice. This appeal is from a divorce case between appellant William Noland and appellee Olivia Noland, but the sole issue is whether the chancery judge erred in denying William's motion for the chancellor to recuse. We affirm the chancery judge's decision.

The Nolands had been married for twenty-six years, but had lived separately during most of their marriage. The parties agreed William would take the divorce as an uncontested matter, and their home would be sold, but William contested the award of any alimony and Olivia's proposed division of marital debts and property, including his retirement pay.

Prior to trial, on October 16, 1995, William had learned that Olivia's attorney, Arkie Byrd, had previously represented the chancellor involving a personal injury claim in 1992. He stated Byrd's representation reflected an actual conflict of interest and an appearance of impropriety which required the chancellor's recusal. A telephone-conference hearing was conducted on William's motion, and immediately following that hearing, the chancery judge denied William's request. On October 25, 1995, the parties tried the remaining alimony and property issues and the chancellor entered her decree on all matters on December 4, 1995. In William's appeal from that December 4, 1995 decree, William raises no points for reversal regarding the divorce decree, but instead only argues the chancellor erred in failing to recuse.

■ Arkansas law is clear that a chancellor shall not sit on the determination of any cause or proceeding in which he or she is interested, or related to either party within the fourth degree of consanguinity or affinity, or shall have been of counsel. *See* Ark. Code Ann. § 16-13-312 (1987); Ark. Const. art. 7, § 20. The interest which is disqualifying under these provisions is a personal proprietary or pecuniary interest or one affecting the individual rights of the judge. The liability, gain, or relief to the judge must turn on the outcome of the suit. *Mears, Co. Judge v. Hall*, 263 Ark. 827, 569 S.W.2d 91 (1987). None of these statutory or constitutional grounds are applicable to the present case.

Nonetheless, William contends the chancellor's prior business relationship with Ms. Byrd runs afoul of Canons 2 and 3 of the Arkansas Code of Judicial Conduct which generally provide a judge shall avoid impropriety and the appearance of impropriety in all of

the judge's duties, and shall perform his or her duties impartially and diligently. William particularly mentions Canon 3E(1)(a) which requires a judge to disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including where the judge has a personal bias or prejudice concerning a party or a party's lawyer.

In considering Canon 3, this court has stated that, where a judge exhibits bias or the appearance of bias, it will reverse. *City of Jacksonville* v. *Venhaus*, 302 Ark. 204, 788 S.W.2d 478 (1990). This court has also held that the proper administration of the law requires not only that judges refrain from actual bias, but also that they avoid all appearances of unfairness. *Id.* When it comes to applying or implementing these principles, the court has said that the fact a judge may have, or develop during the trial, an opinion, or a bias or prejudice, does not make the trial judge so biased and prejudiced as to require his or her disqualification. *Matthews* v. *Rodgers*, 279 Ark. 328, 651 S.W.2d 453 (1983). The *Matthews* court further ruled that, whether a judge has become biased to the point that he or she should disqualify is a matter to be confined to the conscience of the judge, since bias is a subjective matter peculiarly within the knowledge of the trial judge. The *Matthews* court concluded that, absent some objective demonstration of prejudice, it is a communication of bias which will cause us to reverse a judge's decision on disqualification. *Matthews*, 279 Ark. at 331, 651 S.W.2d at 455.

As mentioned earlier, the chancellor explained the circumstances surrounding Ms. Byrd's having represented her on her personal injury claim and that the claim had been settled three years ago. She said she had paid Ms. Byrd a fee at the time of settlement, and that Ms. Byrd's prior representation of her would not prevent her from rendering a fair decision in the Nolands' case. On these facts, we believe the chancellor absolved herself of any actual or statutory bias that would mandate recusal.

Because William has failed to show any actual bias that mandated the chancellor's recusal, it was his burden to show some objective demonstration of prejudice which compelled disqualification. *Matthews*, 279 Ark. 328, 651 S.W.2d 453 (1983); *Venhaus*, 302 Ark. 204, 788 S.W.2d 478. In this respect, William argued the chancellor demonstrated such prejudice when she questioned Olivia Noland during the trial.

Olivia testified on direct examination concerning her income and expenses, and among other things, she related William had

been paying the mortgage and utility payments. When asked about her need for support, Olivia said that she would like for William to pay her $300 per month. After Olivia was cross-examined by William's attorney, the chancellor said she was uncertain as to the amount of Olivia's income and whether the $300 Olivia was requesting was support in addition to the mortgage and utility payments already being paid by William. Olivia responded, "I want — he won't be making my utility bill when this is settled, when I have to move out of the house, the house has been sold. I'm asking $300 a month until I can finish school to help me be able to pay my bills." The chancellor then asked, "Until the house is sold are you asking that he pay the house note . . . and utilities?" Olivia said, "No, ma'am. I'm not asking him to pay the house note or utilities because we have agreed to sell the house." Olivia then left the witness stand, but the chancellor recalled her because the judge believed Olivia did not understand the judge's earlier questions. Olivia expressed confusion, and over William's objection, she retook the stand and stated she would like for William to continue paying the house note and utilities until the house sold, but that she did not need the $300 per month support until after the house was sold.

William claims the foregoing reflects the chancellor's prejudice when she improperly recalled Olivia to the stand and permitted Olivia to clarify her request for support. Citing to Olivia's added testimony, William argues the chancellor wrongly awarded Olivia more support than she had previously requested. The chancellor's decree actually provided that William should make the mortgage ($677.50) and utility payment through November 1995, and if the house had not sold by then, he would pay $600.00 towards the mortgage payment, but Olivia would pay the balance of the payment and all the utility bills. The chancellor further ordered if the house was not sold before October 31, 1996, William would pay only $300 on the mortgage payment for six more months and afterwards Olivia would pay all mortgage and utility payments until the house sold. Commencing in November 1996, William was ordered to pay Olivia temporary spousal support of $300 per month for a period of one year.

In carefully reviewing the record, we believe either the chancellor or Olivia was confused when discussing the mortgage payments, utility bills, and need for spousal support. William had been paying the mortgage and utility payments at the time of trial, but Olivia was requesting temporary alimony to allow her time to

finish school. The question arose during Olivia's examination as to when such support would be needed, and it was clearly appropriate for the chancellor to ask questions that touched on that issue. *See* Rule 614(a) of the Arkansas Rules of Evidence.

William also complains that he does not have the income to satisfy the chancellor's awards, but as noted earlier, he fails to argue reversal on those grounds or contend the awards were clearly erroneous. Instead, he generally discusses the parties' affidavits of financial means, and concludes he is unable to make the payments directed and the awards exhibit actual bias on the part of the chancellor. In reviewing the parties' affidavits and testimony, one could argue that neither party could meet his or her expenses under the decree. Nonetheless, in her decree, the chancellor's award actually favored William by reducing his monthly payments and responsibility for the marital house as time passes and no sale occurs. The announced intention by the chancellor was to force Olivia to do her part to sell the house so both parties could benefit from the sale.

■ Contrary to William's argument, we hold the chancellor's award did not demonstrate any prejudice or reason for her recusal. For the reasons above, we affirm.